**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION**

| | | |
|---|---|---|
| **CLARENCE DANNEL DUNNINGTON,** | § | |
| **#01909127** | § | |
| | § | **CIVIL ACTION NO.  4:20cv506** |
| **VS.** | § | |
| | § | |
| **DIRECTOR, TDCJ-CID** | § | |

<u>**REPORT AND RECOMMENDATION
OF UNITED STATES MAGISTRATE JUDGE**</u>

Petitioner Clarence Dannel Dunnington, an inmate confined in the Texas prison system,

with the assistance of counsel, filed a petition for writ of habeas corpus pursuant to 28 U.S.C.

§ 2254. The petition was referred to United States Magistrate Judge Kimberly C. Priest Johnson

for findings of fact, conclusions of law, and recommendations for the disposition of the case

pursuant to 28 U.S.C. § 636, and the Amended Order for the Adoption of Local Rules for the

Assignment of Duties to the United States Magistrate Judge.

## I.  PROCEDURAL BACKGROUND

Petitioner is challenging his Collin County conviction, Cause No. 296-80895-2013. On

January 17, 2014, a jury found Petitioner guilty of capital murder for retaliation, a first-degree

felony. (Dkt. #10-34, p. 29). In accordance with the jury's verdict on punishment, the trial court

sentenced Petitioner to life confinement without parole. (Dkt. #10-34, p. 29).

Petitioner appealed his conviction, which was affirmed on August 31, 2015. *Dunnington*

*v. State*, No. 05-14-00127-CR, 2015 WL 5121383 (Tex. App. Aug. 31, 2015). Petitioner filed a

petition for discretionary review ("PDR") (Dkt. #10-25), which the Texas Court of Criminal

Appeals ("TCCA") refused on February 24, 2016. *Dunnington*, No. 05-14-00127-CR, 2015 WL

5121383. The United States Supreme Court denied Petitioner's petition for writ of certiorari on October 3, 2016. *Dunnington v. Texas*, 137 S. Ct. 86 (2016).

Petitioner, with the assistance of counsel, filed an application for state habeas corpus relief on September 19, 2017. (Dkt. #10-34, pp. 44-65). On January 21, 2020, after conducting a hearing, the state habeas court entered finding of facts and recommended that Petitioner's application be denied. (Dkt. #10-34, pp. 363-71). On July 1, 2020, the TCCA denied the application without a written order on the findings of the state habeas court after a hearing and on the court's independent review of the record. (Dkt. #10-26).

Petitioner, with the assistance of counsel, filed the instant petition, along with a supporting memorandum, on July 2, 2020. (Dkt. ##1, 2). Petitioner asserts the following claims for relief:

1.    Trial counsel provided ineffective assistance by failing to object to the admission of cell-site location information on constitutional grounds.

2.    Trial counsel provided ineffective assistance by failing to object to the admission of cell phone records and location data pursuant to Article 38.23 of the Texas Code of Criminal Procedure.

3.    Trial counsel provided ineffective assistance by failing to argue in the motion to suppress that the affidavit supporting the search warrant for the "shooter phone" lacked probable cause because it relied on stale information.

(Dkt. #1, pp. 5-8; Dkt. #2). The Director filed a response, arguing that Petitioner's claims are without merit. (Dkt. #9). Petitioner filed a reply. (Dkt. #11).

## II.  FACTUAL BACKGROUND

The Fifth District Court of Appeals set out the facts as follows:

On December 14, 2011, Jessica Velasquez was shot and killed on a residential street in an old and close-knit neighborhood in Plano, Texas, known as the "Douglas Community." Velasquez was twenty-three years' old at the time of her death. She suffered from bi-polar disorder, had drug problems, and sometimes engaged in prostitution for drugs and money. Appellant was one of the dealers who supplied

her. He lived in Wylie, Texas, but had close ties to the Douglas Community, where his grandmother lived, and he was known as "Rabbit."

On December 10, 2011, a few days before she was murdered, Velasquez and her boyfriend Paul Lankfort rented a motel room at a Motel 6. Appellant had also rented a room at the motel and supplied Velasquez drugs throughout the night. The following morning, Detective Jake Wicker was conducting surveillance of the motel. He observed Velasquez exit her motel room, knock on appellant's door a few rooms down, and enter. She emerged about an hour later and returned to the room she shared with Lankfort. Wicker knocked on Velasquez's door and asked her why she had gone to appellant's room. She appeared "high," but denied doing any drugs. But she also told Wicker she had seen drugs in appellant's room. Wicker then knocked on appellant's door, told appellant he had information there were drugs in his room and questioned him about the woman who had just left. Wicker also asked for consent to search. Appellant consented to the search, and police found crack cocaine, a pistol, a ski-mask, two cell phones and $410 in cash. Appellant was arrested and booked into jail.

Two days later, and one day before the murder, appellant was released from jail. He went to the home of Mary Walker who lived in the Douglas Community. Walker testified at trial that appellant was "pissed off," cursed Velasquez, complained that "bitch" got him "arrested," and said when he saw her he was "going to run over her, back up, and run over her again."

The next day, Velasquez got into a car with Octavio Reyna-Rivera, a man she did not know. Reyna-Rivera testified at trial that he agreed to help Velasquez find drugs. Velasquez directed him to Walker's house. Walker was angry with Velasquez for snitching on appellant, but she and her boyfriend Marcus Hernandez agreed to make some calls and find drugs for Velasquez. They used Reyna-Rivera's phone to do so. Phone records show one of the numbers called was to a Nokia phone. The State presented comprehensive evidence showing appellant used that phone to conduct his drug business. For example, evidence showed this was the phone number Velasquez used to contact appellant during the Motel 6 incident, and it was also the phone number Hernandez told police he used to contact appellant.[1]

> [FN1] After Velasquez used the Nokia phone number to contact appellant during the night of the Motel 6 incident, he was arrested with two phones, one a Nokia phone, the other his personal LG phone. When he was jailed, he asked his girlfriend, Jessica Cook, to pick up the Nokia phone and deliver it to a known drug dealer. Upon his release, appellant immediately called the Nokia phone from his personal cell phone. Cell tracking information showed the two phones soon thereafter started "traveling together."

Although they called appellant's cell phone, they also called another drug dealer who agreed to bring Velasquez drugs. After the drugs arrived, Velasquez and

3

Reyna-Rivera went to a parking lot where Velasquez smoked the crack. When she was done, she wanted more. In an effort to find more cocaine, she began making calls on Reyna-Rivera's phone. Reyna-Rivera testified Velasquez was not dialing, but just hitting redial, and he could hear only one side of the conversation. Reyna-Rivera's cell phone records show Velasquez was also receiving incoming calls. The phone records show one of those incoming calls came from the Nokia phone appellant used to conduct his drug business, a number Velasquez had not dialed. After speaking on the phone, Velasquez told Reyna-Rivera that she had found someone who would give her drugs for free. Reyna-Rivera took Velasquez to meet this man. He was the last person Velasquez spoke to on Reyna-Rivera's phone.

When they found him, Velasquez did not appear to know the man. Nevertheless, he got into Reyna-Rivera's car. The man told them he did not have the drugs with him, but directed them to where they could get them. When they arrived at the location to get the drugs, the man got out of the car and immediately shot Velasquez several times at close range.

Reyna-Rivera fled into a nearby home. The gunman followed, shooting at Reyna-Rivera and also at the homeowner. After the gunman fled the scene, Reyna-Rivera returned to Velasquez, who was dead. His cell phone was gone.

Witnesses saw two cars flee the scene after the shooting. One fit the description of Reyna-Rivera's vehicle and the other was a light-colored vehicle with a square back which fit the description of appellant's Ford Fusion.

Almost immediately after the shooting, Velasquez's boyfriend Lankfort received a call from "Shay," another local drug dealer who knew Velasquez. Shay told Lankford Velasquez had been killed for being a snitch. Shay also told Lankford where he could find Velasquez's body. Lankfort then went to the scene, where he told police about Shay's call.

Police discovered that Velasquez, just three days prior, had given police information that led to appellant's arrest. Police had also received anonymous phone tips that "Rabbit" and "Cagan" had been involved in a murder.

The State also provided evidence, through phone records, that showed appellant was in possession of the Nokia phone used by the gunman shortly before the murder. Specifically, about an hour before the murder, texts were exchanged between the Nokia phone and Susan Mounsey, a woman with whom appellant had a sexual relationship, but was otherwise without ties to appellant's associates or the Douglas Community.

The State also presented "cell phone tracking" evidence, specifically evidence from which the location of a cell phone could be determined. That evidence showed that both the phone the gunman used and appellant's personal cell phone were in the vicinity of the murder when it occurred and that both phones then "traveled" to

4

Wylie, Texas, immediately after the murder. The State further showed the Nokia phone was later found in a search of appellant's residence after his arrest for this offense.

After hearing the evidence, the jury was instructed in accordance with the law of parties, and found appellant guilty of capital murder. . . .

*Dunnington*, No. 05-14-00127-CR, 2015 WL 5121383, at **1-2.

### III.  STANDARD FOR FEDERAL HABEAS CORPUS RELIEF

The role of federal courts in reviewing habeas corpus petitions by prisoners in state custody is exceedingly narrow. A person seeking federal habeas corpus review must assert a violation of a federal constitutional right. *Lowery v. Collins*, 988 F.2d 1354, 1367 (5th Cir. 1993); *Malchi v. Thaler*, 211 F.3d 953, 957 (5th Cir. 2000). Federal habeas corpus relief will not issue to correct errors of state constitutional, statutory, or procedural law, unless a federal issue is also present. *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991); *West v. Johnson*, 92 F.3d 1385, 1404 (5th Cir. 1996); *Brown v. Dretke*, 419 F.3d 365, 376 (5th Cir. 2005). In the course of reviewing state proceedings, a federal court does not sit as a super state appellate court. *Dillard v. Blackburn*, 780 F.2d 509, 513 (5th Cir. 1986).

The prospect of federal courts granting habeas corpus relief to state prisoners has been further limited by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). The new provisions of § 2254(d) provide that an application for a writ of habeas corpus shall not be granted with respect to any claim that was adjudicated on the merits in state court proceedings unless the adjudication of the claim: (1) was contrary to federal law then clearly established in the holdings of the Supreme Court; (2) involved an unreasonable application of clearly established Supreme Court precedent; or (3) was based on an unreasonable determination of the facts in light of the record before the state court. *See Harrington v. Richter*, 562 U.S. 86, 97-98 (2011).

The statutory provision requires federal courts to be deferential to habeas corpus decisions on the merits by state courts. *Renico v. Lett*, 559 U.S. 766, 773 (2010); *Moore v. Cockrell*, 313 F.3d 880, 881 (5th Cir. 2002). Furthermore, a state court's factual findings are entitled to deference and are presumed correct unless the petitioner rebuts those findings with clear and convincing evidence. *Wooten v. Thaler*, 598 F.3d 215, 218 (5th Cir. 2010); *Garcia v. Quarterman*, 454 F.3d 441, 444 (5th Cir. 2006); *Valdez v. Cockrell*, 274 F.3d 941, 947 (5th Cir. 2001); *see also Moore*, 313 F.3d at 881 (the statutory provision requires federal courts to be deferential to habeas corpus decisions on the merits by state courts). This deference extends not only to express findings of fact, but also to any implicit findings of the state court. *Garcia*, 454 F.3d at 444-45 (citing *Summers v. Dretke*, 431 F.3d 861, 876 (5th Cir. 2005)).

A decision by a state court is "contrary to" the Supreme Court's clearly established law if it "applies a rule that contradicts the law set forth in" the Supreme Court's cases. *Brown v. Payton*, 544 U.S. 133, 141 (2005) (citing *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000)). A federal court's review of a decision based on the "unreasonable application" test should only review the "state court's 'decision' and not the written opinion explaining that decision." *Neal v. Puckett*, 286 F.3d 230, 246 (5th Cir. 2002). "Under § 2254(d)(1)'s 'unreasonable application' clause, then, a federal habeas corpus court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Williams*, 529 U.S. at 411. Rather, that application must be objectively unreasonable. *Id.* at 409. "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree'" on the correctness of the decision. *Richter*, 562 U.S. at 87 (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). "Where a state court's decision is unaccompanied by an explanation, the habeas petitioner's burden still must

be met by showing there was no reasonable basis for the state court to deny relief." *Richter*, 562 U.S. at 98; *see Johnson v. Williams*, 568 U.S. 289, 293 (2013) (holding there is a rebuttable presumption that the federal claim was adjudicated on the merits when the state court addresses some claims, but not others, in its opinion).

"In Texas writ jurisprudence, usually a denial of relief rather than a 'dismissal' of the claim by the Court of Criminal Appeals disposes of the merits of a claim." *Singleton v. Johnson*, 178 F.3d 381, 384 (5th Cir. 1999); *see also Henderson v. Cockrell,* 333 F.3d 592, 598 (5th Cir. 2003); *Ex parte Torres*, 943 S.W.2d 469, 472 (Tex. Crim. App. 1997) (holding a "denial" signifies an adjudication on the merits while a "dismissal" means the claim was declined on grounds other than the merits). Thus, a state application that is denied without written order by the TCCA, as in the present case, is an adjudication on the merits. *See Singleton*, 178 F.3d at 384; *Ex parte Torres*, 943 S.W.2d at 472.

In addition to the standard of review imposed by the AEDPA, the petitioner must also show that any constitutional error had a "substantial and injurious effect or influence" on the verdict to be entitled to habeas relief. *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993). The Supreme Court recently explained that, while the passage of the AEDPA "announced certain new conditions to [habeas] relief," it did not supersede or replace the harmless error standard announced in *Brecht*. *Brown v. Davenport*, ___ U.S. ___, 142 S. Ct. 1510, 1524 (2022). In other words, a habeas petitioner must also satisfy *Brecht*, even if the AEDPA applies. *See id.* ("[A] federal court must deny relief to a state habeas petitioner who fails to satisfy either [*Brecht*] or AEDPA. But to *grant* relief, a court must find that the petition has cleared both tests.") (emphasis in original). Additionally, federal habeas relief is foreclosed if a claim: (1) is procedurally barred as a consequence of a failure to comply with state procedural rules, *Coleman v. Thompson*, 501 U.S.

722 (1991); or (2) seeks retroactive application of a new rule of law to a conviction that was final before the rule was announced, *Teague v. Lane*, 489 U.S. 288 (1989).

Thus, the federal writ serves as a "'guard against extreme malfunctions in the state criminal justice systems,' not a substitute for ordinary error correction through appeal." *Richter*, 562 U.S. at 102-03 (quoting *Jackson v. Virginia*, 443 U.S. 307, 332 n.5 (1979)). "If this standard is difficult to meet, that is because it was meant to be." *Id.* at 102.

## IV. ANALYSIS

Petitioner asserts claims of ineffective assistance of trial counsel. A petitioner who seeks to overturn his conviction on the grounds of ineffective assistance of counsel must prove entitlement to relief by a preponderance of the evidence. *James v. Cain*, 56 F.3d 662, 667 (5th Cir. 1995). Ineffective assistance of counsel claims are governed by the Supreme Court's standard established in *Strickland v. Washington*, 466 U.S. 668 (1984). *Strickland* provides a two-pronged standard, and the petitioner bears the burden of proving both prongs. *Id.* at 687.

Under the first *Strickland* prong, the petitioner must show that counsel's performance was deficient. *Id.* To establish deficient performance, he must show that "counsel's representation fell below an objective standard of reasonableness," with reasonableness examined under professional norms prevailing at the time counsel rendered assistance. *Id.* at 688. The *Strickland* court further explained:

> Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. . . . A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight . . . .

*Id.* at 689 (citations omitted). "Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of

professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Id.* (internal quotation marks omitted).

Under the second prong of the *Strickland* test, the petitioner must show that his attorney's deficient performance resulted in prejudice. *Id.* at 687. To satisfy the prejudice prong, the habeas petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694. An ineffective assistance of counsel claim fails if a petitioner cannot satisfy either the deficient performance or prejudice prong; a court need not evaluate both if he makes an insufficient showing as to either. *Id.* at 697.

In addition to applying the *Strickland* two-prong test, a federal habeas court must review a state petitioner's ineffective assistance of counsel claim "through the deferential lens of [28 U.S.C.] § 2254(d)." *Cullen v. Pinholster*, 563 U.S. 170, 190 (2011). Reviewing Petitioner's ineffective assistance of counsel claim through the lens of the AEDPA means that he has a higher bar to exceed in order to prevail. "Surmounting *Strickland*'s high bar is never an easy task." *Padilla v. Kentucky*, 559 U.S. 356, 371 (2010). "Establishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult" because "[t]he standards created by *Strickland* and § 2254(d) are both 'highly deferential,' and when the two apply in tandem, review is 'doubly' so." *Richter*, 562 U.S. at 105 (citations omitted). Moreover, unreasonableness under *Strickland* and under § 2254(d) are not the same. First, "[t]he *Strickland* standard is a general one, so the range of reasonable applications is substantial." *Id.* Second, "[w]hen § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any

reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Id.* The Court must consider not only whether the state court's determination was incorrect, but also "whether that determination was unreasonable—a substantially higher threshold." *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009) (citing *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007)). Thus, in light of the deference accorded by § 2254(d), "[t]he pivotal question is whether the state court's application of the *Strickland* standard was unreasonable." *Richter*, 562 U.S. at 101.

Furthermore, a petitioner's allegations of ineffective assistance of counsel must be supported by the record. *United States v. Johnson*, 679 F.2d 54, 58-59 (5th Cir. 1982). Even when liberally construing pro se pleadings, "mere conclusory allegations on a critical issue . . . are insufficient to raise a constitutional issue." *Black v. Davis*, 902 F.3d 541, 547 (5th Cir. 2018) (citation omitted). More specifically, conclusory statements are insufficient to sustain a claim of ineffectiveness. *Sayre v. Anderson*, 238 F.3d 631, 635-36 (5th Cir. 2001).

Petitioner asserts that his trial counsel was ineffective for failing to object or file motions to suppress in several instances. A failure to object does not constitute deficient representation unless a sound basis exists for objection. *See Emery v. Johnson*, 139 F.3d 191, 198 (5th Cir. 1997) (a futile or meritless objection cannot be grounds for a finding of deficient performance). Even with such a basis, however, an attorney may render effective assistance despite a failure to object when the failure is a matter of trial strategy. *See Burnett v. Collins*, 982 F.2d 922, 930 (5th Cir. 1993) (noting that a failure to object may be a matter of trial strategy as to which courts will not second guess counsel). Failure to make frivolous objections does not cause counsel's performance to fall below an objective level of reasonableness. *See Green v. Johnson*, 160 F.3d 1029, 1037 (5th Cir. 1998). Indeed, it is clear in the Fifth Circuit that "counsel is not required to make futile motions or objections." *Roberts v. Thaler*, 681 F.3d 597, 611 (5th Cir. 2012) (quoting *Koch v. Puckett*, 907

F.2d 524, 527 (5th Cir. 1990)); *see also Murray v. Maggio*, 736 F.2d 279, 283 (5th Cir. 1984). "Failure to raise meritless objections is not ineffective lawyering; it is the very opposite." *Clark v. Collins*, 19 F.3d 959, 966 (5th Cir. 1994). Furthermore, a determination of ineffectiveness "depends on whether either a suppression motion or an objection would have been granted or sustained had it been made." *United States v. Oakley*, 827 F.2d 1023, 1025 (5th Cir. 1987); *McLean v. Dir., TDCJ-CID*, No. 4:07CV298, 2010 WL 3702585, at *6 (E.D. Tex. Sept. 15, 2010).

With the foregoing principles in mind, the Court will turn to Petitioner's specific allegations of ineffective assistance of counsel.

### A.    Failure to Object to Cell-Site Location Data on Fourth Amendment Grounds (Claim One)

In Claim One, Petitioner asserts that trial counsel provided ineffective assistance by failing to object to the admission of cell-site location information on Fourth Amendment grounds. (Dkt. #1, p. 5; Dkt. #2, pp. 23-35). Petitioner argues that, because "the cell phone records essentially constituted the State's entire case" (Dkt. #2, p. 31) and because the law at the time of Petitioner's trial was unclear or undecided, trial counsel had an obligation to object on Fourth Amendment grounds. (Dkt. #2, pp. 31-33). Petitioner further contends that, "[d]ue to the State's heavy reliance on this evidence to connect [Petitioner] to the decedent's murder, a reasonable probability exists that the outcome of the trial would have been different if the evidence had been excluded." (Dkt. #2, p. 35).

This claim was fully developed during the state habeas corpus proceedings. Petitioner's trial counsel, Ms. Robbie McClung (first chair) and Mr. Richard Franklin (second chair), submitted affidavits (Dkt. #10-34, pp. 236-39, p. 243)[1] and testified at the evidentiary hearing. In his

---

[1] In Ms. McClung's affidavit, she states that she and Mr. Franklin "prepared the answers to the designated issues contained in [Mr. Franklin's] affidavit." (Dkt. #10-34, p. 243). At the evidentiary hearing, Ms. McClung confirmed that she reviewed Mr. Franklin's affidavit and adopted it. (Dkt. #10-34, p. 26).

affidavit, Mr. Franklin explained why defense counsel chose not to file a motion to suppress the cell phone location data:

> The Applicant asserts that the real time cell phone location data should have been suppressed. We did not file a motion to suppress this information because this information belonged to third parties, not the defendant. The third parties, Sprint and T-Mobile, voluntarily turned over this information to the Plano Police Department. Such requests by law enforcement are made every day. Sprint and T-Mobile did not require a warrant or court order before they turned over this information. The information provided was used for business purposes by Sprint and T-Mobile. The Applicant cites the **Ford** case which holds that there is no fourth amendment issue regarding this data. The Court of Criminal Appeals acknowledges that the Supreme Court is going to take up the issue of warrantless seizure of historical cell-phone records revealing the location and movements of a cell phone user over at least an extended period of time. The Court of Criminal Appeals believes its ruling in **Ford** will still be valid because the location data in that case was for a mere four days. The data in this case was for an even shorter period of time.

(Dkt. #10-34, pp. 236, 243).

At the evidentiary hearing, Mr. Franklin acknowledged on cross-examination that "cell phones played a big part" in this case, and on redirect examination, he agreed that the "cell phone evidence was, by far, the strongest." (Dkt. #10-34, pp. 219, 223). On recross-examination, the prosecutor highlighted that there was evidence other than the cell phone evidence that implicated Petitioner in the murder, including testimony that Petitioner was upset with Velasquez for reporting drug activity in his room at Motel 6 a few days before the murder, testimony that Petitioner said he was going to run over Velasquez with his car, testimony that Petitioner told Velasquez's boyfriend that she was killed because she was a snitch, and evidence that Petitioner had no alibi. (Dkt. #10-34, pp. 223-24).

The state habeas court found that both Ms. McClung and Mr. Franklin were "well known to the court, and credible," and that their affidavits and testimony at the hearing were credible.

(Dkt. #10-34, p. 363, ¶¶ 1-6). The state habeas court then issued the following findings concerning

Claim One:

> 9. Applicant alleges that counsel was ineffective for not objecting to the admission of cell phone data in this case on grounds that the police department's lack of a search warrant for the information violated the Applicant's rights under the Fourth Amendment.

> 10. Applicant points to *Ford v. State*, 477 S.W.3d 321 (Tex. Crim. App. 2015) and the Supreme Court's grant of certiorari in *United States v. Carpenter*, 819 F. 3d 880 (6th Cir. 2016);

> 11. Since Applicant filed his application for writ of habeas corpus in this case, the Supreme Court rendered its decision and remanded the case back to the Sixth Circuit in a sharply divided 5-4 opinion that distinguished two prior decisions of the Court. *Carpenter v. United States*, 138 S. Ct. 2206 (2018). On remand, the Sixth Circuit held that while the Government's acquisition of Carpenter's cell site location information violated the Fourth Amendment, the district court properly denied suppression because the agents relied in good faith on the SCA when they obtained the data. *United States v. Carpenter*, 926 F.3d 313 (6th Cir. 2019);

> 12. Neither *Ford* or *Carpenter* had been decided at the time of Applicant's January 2014 trial;

> 13. As recently as 2018, the state of the law was that a warrant was not required for law enforcement to obtain cell site location information from cell-phone providers;

> 14. Defense attorneys are not required to anticipate changes in the law: Clairvoyance is not a required attribute of effective representation. *United States v. Fields*, 565 F.3d 290, 294-297 (5th Cir. 2009);

> 15. Applicant has not shown by a preponderance of the evidence that, based on the law at the time, counsel was deficient for not seeking to suppress the historical cell phone data;

> 16. Applicant has not shown by a preponderance of the evidence that, based on the law at the time, the evidence would have been suppressed;

> 17. Although there may be some basis for an objection regarding real-time cell phone data under the current state of the law, the state of the law at the time of Applicant's trial was not clear on whether a warrant was required for real-time cell phone data;

18.   Applicant has not shown by a preponderance of the evidence that counsel was deficient for not seeking to suppress real-time cell site location information;

19.   Applicant has not shown by a preponderance of the evidence that the real-time cell site location information would have been suppressed[.]

(Dkt. #10-34, pp. 364-66). The TCCA subsequently denied relief without a written order based on the findings of the state habeas court after a hearing and on the court's independent review of the record (Dkt. #10-26), which constitutes an adjudication on the merits. *See Singleton*, 178 F.3d at 384.

A review of the record fails to show that the state court's determination was in conflict with established federal law or was objectively unreasonable, and nothing in the record rebuts the presumption of factual correctness of the state court's findings with clear and convincing evidence. At trial, the State also provided evidence, through phone records, that showed Petitioner was in possession of the Nokia phone used by the gunman (the "shooter phone") shortly before the murder. The court also admitted Petitioner's cell phone records, which included cell-site data pinpointing the location of the "shooter phone" and Petitioner's personal cell phone at the time of the murder and immediately thereafter. The United States Supreme Court has described this type of evidence as follows:

There are 396 million cell phone service accounts in the United States—for a Nation of 326 million people. Cell phones perform their wide and growing variety of functions by connecting to a set of radio antennas called "cell sites." Although cell sites are usually mounted on a tower, they can also be found on light posts, flagpoles, church steeples, or the sides of buildings. Cell sites typically have several directional antennas that divide the covered area into sectors.

Cell phones continuously scan their environment looking for the best signal, which generally comes from the closest cell site. Most modern devices, such as smartphones, tap into the wireless network several times a minute whenever their signal is on, even if the owner is not using one of the phone's features. Each time the phone connects to a cell site, it generates a time-stamped record known as cell-site location information (CSLI). The precision of this information depends on the

size of the geographic area covered by the cell site. The greater the concentration of cell sites, the smaller the coverage area. As data usage from cell phones has increased, wireless carriers have installed more cell sites to handle the traffic. That has led to increasingly compact coverage areas, especially in urban areas.

Wireless carriers collect and store CSLI for their own business purposes, including finding weak spots in their network and applying "roaming" charges when another carrier routes data through their cell sites. In addition, wireless carriers often sell aggregated location records to data brokers, without individual identifying information of the sort at issue here. While carriers have long retained CSLI for the start and end of incoming calls, in recent years phone companies have also collected location information from the transmission of text messages and routine data connections. Accordingly, modern cell phones generate increasingly vast amounts of increasingly precise CSLI.

*Carpenter v. United States*, 138 S. Ct. 2206, 2211-12 (2018). In *Carpenter*, the Supreme Court considered the Fourth Amendment implications of this type of evidence-gathering by the police—through which, given developing technology, the "suspect . . . has effectively been tailed every moment of every day"—ultimately concluding that the government must use a search warrant to obtain this type of information. *Id.* at 2218, 2221.

It is undisputed that in this case there was no such warrant, nor did Petitioner's trial counsel argue that the prosecution should have obtained one. However, Petitioner's criminal case was tried in January of 2014, over four years before the Supreme Court's decision in *Carpenter*, prior to which law enforcement officers were not legally required to obtain a search warrant for cell-site data. Petitioner's trial counsel cannot be expected to have anticipated this change in the law several years later, and courts must be watchful to "eliminate the distorting effects of hindsight." *Strickland*, 446 U.S. at 689; *see also United States v. Fields*, 565 F.3d 290, 296 (5th Cir. 2009) (holding that there is no duty of counsel to anticipate changes in the law). In *Carpenter*, the Court explicitly noted that the question it confronted, in 2018, was a "new phenomenon" that had not yet been decided. 138 S. Ct. at 2216. Notably, at the time of Petitioner's trial in January of 2014, and as recently as 2018, neither Texas courts nor the Fifth Circuit recognized a reasonable expectation

of privacy in historical cell-site location data obtained from the records of a cell phone service provider, and no warrant was required to obtain it. *See, e.g.*, *United States v. Wallace*, 885 F.3d 806, 810 (5th Cir. 2018) ("Whether obtaining E911 data constitutes a search within the meaning of the Fourth Amendment is still an open question in this Circuit. Nor need we reach that issue here."); *United States v. Guerrero*, 768 F.3d 351, 359 (5th Cir. 2014) (holding that historical cell-site information—that is, a record that the provider has already created—is not subject to a reasonable expectation of privacy that implicates the Fourth Amendment); *In re Application of the United States for Historical Cell Site Data*, 724 F.3d 600, 615 (5th Cir. 2013) (concluding that the government can use Stored Communications Act orders to obtain cell-site location information without implicating the Fourth Amendment); *Hankston v. State*, 517 S.W.3d 112, 120-22 (Tex. Crim. App. 2017) (holding that the warrantless acquisition of cell phone records did not violate Article I, Section 9 of the Texas Constitution and that an individual's rights pertaining to call logs and cell-site location information possessed by a third party are the same under both the Fourth Amendment and under Art. I, § 9); *Ford v. State*, 477 S.W.3d 321, 330-35 (Tex. Crim. App. 2015) (holding that the Fourth Amendment permitted the State to obtain without a warrant historical cell-site-location information of four days' duration);[2] *Barfield v. State*, 416 S.W.3d 743, 749 (Tex.

---

[2] In *Ford v. State*, 477 S.W.3d 321 (Tex. Crim. App. 2015), every participating member of the TCCA joined in holding that the Fourth Amendment permitted the State to obtain without a warrant historical cell-site-location information of four days' duration, even while acknowledging "that Fourth Amendment concerns might be raised if long-term location information were acquired[.]" *Id.* at 334-35. Observing that the United States Supreme Court was "primed" to take up this issue, the TCCA predicted that it would eventually hold that the State's warrantless acquisition of no more than four days' worth of cell-site-location information data from Ford's service provider would be found acceptable because it "falls squarely inside the third-party-doctrine ball-park." *Id.* at 335; *see also Love v. State*, 543 S.W.3d 835, 841 (Tex. Crim. App. 2016) (holding, on authority of *Ford*, that "Appellant's call logs and [cell-site-location information] are not . . . constitutionally protected"). Sixteen months later, the United States Supreme Court had still not taken up the issue, and the TCCA was confronted with the question of whether it would construe its own constitutional analog any differently than they had foreseen the United States Supreme Court resolving the Fourth Amendment question. The TCCA opted to follow the path it thought the United States Supreme Court would eventually take in its Fourth Amendment jurisprudence, as the TCCA had predicted in *Ford*. *See Hankston v. State*, 517 S.W.3d 112, 120 (Tex. Crim. App. 2017). Accordingly, the TCCA unanimously held in *Hankston* that it would be consistent with Article I, Section 9, for the State to obtain some twelve months of cell-site-location information data without a warrant. *Id.* at 114, 121-22. The TCCA explained that "[t]here was a voluntary conveyance of the cell

App. 2013) (holding that the State's obtaining of cell tower records from the third-party provider did not violate reasonable privacy expectations as defined by *Katz v. United States*, 389 U.S. 347 (1992), and its progeny).

As such, the Court finds that trial counsel's failure to object in 2014 to the State's use of cell-site location data that was obtained without a search warrant, at a time when none was required, did not render the assistance Petitioner received ineffective. Petitioner has failed to show that the state court unreasonably applied *Strickland*'s deficiency prong of an ineffective assistance of counsel claim when it "judged . . . counsel's conduct under the law *existing at the time of the conduct*." *Lave v. Dretke*, 416 F.3d 372, 379-80 (5th Cir. 2005) (emphasis in original) (quoting *Westley v. Johnson*, 83 F.3d 714, 723 (5th Cir. 1996)). Moreover, Petitioner has failed to show that the state court unreasonably applied *Strickland*'s prejudice prong when it concluded that a suppression motion based on Fourth Amendment grounds would not have been successful. In sum, Petitioner fails to show that there was no reasonable basis for the state court to deny relief. *Richter*, 562 U.S. at 98. There are no grounds for habeas relief under Claim One, and the claim should be denied.

**B.    Failure to Object to Cell Phone Location Data Under Article 38.23 (Claim Two)**

In Claim Two, Petitioner contends that trial counsel provided ineffective assistance by failing to object to the admission of cell phone records and location data pursuant to the

---

phone records, and, under the third-party doctrine, that conveyance destroyed the reasonable expectation of privacy in the conveyed information." *Id.* at 122. The TCCA applied the third-party doctrine to reach this result, not because it deemed itself bound to interpret Article I, Section 9, of the Texas constitution in lockstep with Fourth Amendment jurisprudence, but because the TCCA thought it made "more sense" to construe both the Fourth Amendment and Article I, Section 9, in this way. *Id.* at 120. As it turned out, the TCCA's prediction about how the United States Supreme Court would interpret the Fourth Amendment was wrong. *See Holder v. State*, 595 S.W.3d 691, 706 (Tex. Crim. App. 2020).

exclusionary rule of Article 38.23 of the Texas Code of Criminal Procedure.[3] (Dkt. #1, p. 7; Dkt. #2, pp. 35-43). Specifically, Petitioner asserts that trial counsel should have objected on the basis that the cell phone location records and call logs were seized in violation of the Stored Communications Act, 18 U.S.C § 2701, and therefore, the records were subject to exclusion pursuant to Article 38.23 of the Texas Code of Criminal Procedure. (Dkt. #2, p. 38; Dkt. #11, pp. 5-7).

This claim was fully developed during the state habeas corpus proceedings. In his affidavit, Mr. Franklin stated:

> The second issue raised by the Applicant is that the cell phone data retrieval violated the Stored Communications Act and therefore the data should have been excluded under Article 38.23 of the Code of Criminal Procedure. The Applicant does not cite a particular section of the Stored Communications Act that was violated. The pertinent section of the Act, with which we are familiar, is 18 USC 2702(c)(4). This section allows disclosure of data to a government entity in a situation where it can be shown there is an emergency involving danger of death or serious bodily injury to any person. The Applicant cites a case out of Georgia and misstates the ruling in that case. The Georgia Supreme Court ruled in **Registe** that "the release of Registe's phone records by Cricket to the police complied with the state **and federal** statutory provisions cited above and precluded suppression of the evidence". (Emphasis added) The federal statutory provision referenced was 18 USC 2702(c)(4). **Registe** involved the murder of two people. The instant case involves the murder of the victim, the shooting of her companion, and the invasion of a home and shooting of the occupant five times. The occupant of the home being a totally random victim. All of this in a residential neighborhood. The shooter in the instant case could be classified as extremely dangerous to civilians and police. The Applicant cites no Texas cases on this point. It is extremely unlikely that [t]he Court of Criminal Appeals would ever rule differently than the Georgia Supreme Court. There being no violation of federal law, the information would not be suppressed under 38.23 of the Code of Criminal Procedure.

(Dkt. #10-34, pp. 236-37, 243).

After finding defense counsel credible (Dkt. #10-34, p. 363, ¶¶ 1-6), the state habeas court issued the following findings concerning this claim:

---

[3] Petitioner states that if habeas relief is granted on Claim One, this claim becomes moot. (Dkt. #2, p. 37). As the Court has recommended that habeas relief not be granted on Claim One, the Court will address Claim Two.

20.     Applicant argues that trial counsel was ineffective because he did not move to have the cell site location information suppressed under article 38.23 of the Texas Code of Criminal Procedure because the police violated article 18.21 of the Code of Criminal Procedure, which was repealed effective January 1, 2019, and the Federal Stored Communications Act, 18 U.S.C. §§ 2702, 2703, 2707 (the SCA).

21.     Unless a constitutional violation has occurred, neither the SCA nor article 18.21 require[s] suppression of the evidence. *United States v. Wallace*, 885 F.3d 806, 809-10 (5th Cir. 2018); *Love v. State*, 543 S.W. 3d 835, 845 n.8 (Tex. Crim. App. 2016); *see also* 18 U.S.C. § 2708; Tex. Code Crim. Proc. art. 18.21, § 13, *now codified* as Tex. Code Crim. Proc. art. 18B.533.

22.     As recently as 2018, the state of the law was that a warrant was not required for law enforcement to obtain cell site location information from cell-phone providers;

23.     Applicant has not shown by a preponderance of the evidence that counsel was deficient for not seeking to have the cell phone data excluded under article 38.23 at the time of trial;

24.     Applicant has not shown by a preponderance of the evidence that the evidence would have been suppressed under article 38.23 at the time of trial[.]

(Dkt. #10-34, pp. 366-67). The TCCA subsequently denied relief without a written order based on the findings of the state habeas court after a hearing and on the court's independent review of the record (Dkt. #10-26), which constitutes an adjudication on the merits. *See Singleton*, 178 F.3d at 384.

Article 38.23(a) of the Texas Code of Criminal Procedure states: "No evidence obtained by an officer or other person in violation of any provisions of the Constitution or laws of the State of Texas, or of the Constitution or laws of the United States of America, shall be admitted in evidence against the accused on the trial of any criminal case." Article 38.23(a) is a general statutory suppression remedy. Unlike Article 38.23(a), the Stored Communications Act is a detailed statute that addresses the collection of cell phone subscriber records, like the location information at issue here. The Stored Communications Act also contains an exclusivity clause.

That is, the Stored Communications Act contains a provision stating that, absent a federal constitutional violation, the only available judicial remedies are those provided for in the statutes.[4] 18 U.S.C. § 2708 ("The remedies and sanctions described in this chapter are the only judicial remedies and sanctions for nonconstitutional violations of this chapter."). The TCCA has concluded that the exclusivity provision in the Stored Communications Act prevails as an exception to the general Article 38.23(a) remedy of suppression when dealing with non-constitutional violations of the Stored Communications Act and has thus held that suppression is not an available remedy for non-constitutional violations of the Stored Communications Act. *Sims v. State*, 569 S.W.3d 634, 642 (Tex. Crim. App. 2019). Similarly, federal courts have applied the plain language of the exclusivity clause in the Stored Communications Act and concluded that suppression is not an available remedy for non-constitutional violations. *See United States v. Beaudion*, 979 F.3d 1092, 1101 (5th Cir. 2020); *Wallace*, 885 F.3d at 809-10; *Guerrero*, 768 F.3d at 358; *United States v. Gasperini*, 894 F.3d 482, 488 (2d Cir. 2018); *United States v. Perrine*, 518 F.3d 1196, 1202 (10th Cir. 2008); *United States v. Smith*, 155 F.3d 1051, 1056 (9th Cir. 1998); *cf. United States v. Clenney*, 631 F.3d 658, 667 (4th Cir. 2011) ("[T]here is no exclusionary rule generally applicable to statutory violations." (quoting *United States v. Abdi*, 463 F.3d 547, 556 (6th Cir. 2006))); *Davis v. United States*, 564 U.S. 229, 236, (2011) (explaining that the exclusionary rule "is a 'prudential' doctrine created by this Court to 'compel respect for the constitutional guaranty,'" and is aimed at "deter[ring] future Fourth Amendment violations"). For a defendant to suppress the cell phone location data, he therefore must show that the data was obtained not just in violation of the Stored Communications Act, but also in violation of the Fourth

---

[4] Remedies for violations of the Stored Communications Act include civil actions and sometimes administrative discipline against federal employees. 18 U.S.C. § 2707.

Amendment. *See Beaudion*, 979 F.3d at 1101; *Guerrero*, 768 F.3d at 358; *Sims*, 569 S.W.3d at
642.

   As explained above, at the time of Petitioner's trial, there was no recognized Fourth
Amendment claim in the seizure of cell-site location information. Without a Fourth Amendment
violation, suppression is not an available remedy under the Stored Communications Act. Because
there was no clear claim of a Fourth Amendment violation under the law at the time of Petitioner's
trial, and as courts have concluded that suppression is not an available remedy for non-
constitutional violations under the Stored Communications Act, the Court finds that trial counsel's
decision not to seek suppression of the cell phone data under Article 38.23 did not render the
assistance Petitioner received ineffective. Petitioner has failed to show that the state court
unreasonably applied *Strickland*'s deficiency prong of an ineffective assistance of counsel claim
when it "judged . . . counsel's conduct under the law *existing at the time of the conduct*." *Lave*,
416 F.3d at 379-80 (emphasis in original) (quoting *Westley*, 83 F.3d at 723). Moreover, Petitioner
has failed to show that the state court unreasonably applied *Strickland*'s prejudice prong when it
concluded that a suppression motion pursuant to Article 38.23 based on a violation of the Stored
Communications Act would not have been successful. In sum, Petitioner fails to show that there
was no reasonable basis for the state court to deny relief. *Richter*, 562 U.S. at 98. There are no
grounds for habeas relief under Claim Two, and the claim should be denied.

**C.    Failure to Argue Lack of Probable Cause in Motion to Suppress (Claim Three)**

   In Claim Three, Petitioner argues that trial counsel provided ineffective assistance by
failing to argue in the motion to suppress that the affidavit supporting the search warrant for the
"shooter phone" lacked probable cause because it relied on stale information. (Dkt. #1, p. 8; Dkt.
#2, pp. 44-50).

On January 10, 2014, three days before trial, Plano Police Department Detective Pfahning obtained a warrant to search Petitioner's parents' residence in Wylie, Texas (which was where Petitioner was living) for the "shooter phone," which was described as a "T-Mobile Nokia cell phone, believed to be black/dark blue in color, with number (972) 693-4560. IMSI-310260435028202." (Dkt. #10-4, pp. 181-83; Dkt. #10-34, pp. 244-47). The probable cause affidavit supporting the search warrant relied in part on a recording of an August 2013 jail call between Petitioner and his mother. (Dkt. #10-4, pp. 181-82, 194; Dkt. #10-34, pp. 244-45). Specifically, the warrant affidavit stated:

> On January 4, 2014, Affiant learned from the Collin County DA Office that jail phone calls indicated Dunnington had several phones at his residence in his room. Affiant obtained the jail calls and listened to them. In a phone call on August 17, 2013, Dunnington is speaking to his "mother" Derrice Harris who is at his residence. Dunnington instructs Harris to go to his room and retrieve a number for him from a collection of phones he has in his room. Dunnington tells Harris there are "10 cell phones" in the room. During the same phone call, Harris tells Dunnington she boxed the cell phones up and placed the box under his bed. Dunnington seems upset by this. Subsequent phone calls reveal Dunnington makes it clear to Harris not to touch things in his room. No other calls show any movement of the phones for any reason.

(Dkt. #10-34, p. 245). In addition to the jail call, Detective Pfahning (the affiant) also identified the following facts as contributing to his probable cause determination:

> Affiant . . . has been investigating a Capital Murder that occurred at 1108 Ave F, Plano, Texas on December 14, 2011. The victim, Jessica Velasquez was killed by an unknown suspect after contacting the suspect on his cell phone with the number of 972-693-4560 to set up a drug deal.

> During the murder investigation, Affiant developed a suspect by the name of Clarence Dunnington B/M/06/23/1988. Dunnington had been involved in an offense in which the victim had given narcotics information that led to Dunnington's arrest in 3 days before the murder. Affiant learned from the narcotics arrest report that pictures of a Nokia cell phone believed to be the suspect phone were taken and the phone was in Dunnington's property at the Plano City Jail.

> Affiant determined through cell records and witness testimony that Dunnington was known by the nick name "Rabbit" and used cell phone number 972-693-4560 for

22

his drug dealing activities. Examination of the suspect cell phone records showed the suspected cell phone was tracked from the area of the murder to Wylie, Texas to a cell tower close to Dunnington's residence at 313 Waterwood immediately after the offense. The suspect cell phone's last tracking information shows the cell phone hitting that same cell tower in the area of Dunnington's house on December 15, 2011. Surveillance information conducted by Plano Police detectives revealed Dunnington was in the same area as the suspect phone while the phone was tracked. The cell phone records that the suspect cellphone was intentionally deactivated on December 15, 2011. The phone was never recovered.

Dunnington was arrested as a party to the offense of Capital Murder as a result of the Capital Murder investigation in January 2012. Affiant knows from jail records that Dunnington has been in custody since January 2012.

. . . .

Affiant knows through a computer check of Dunnington's criminal history and the Capital Murder investigation that Dunnington has been arrested for possessing drugs and has been implicated as a "drug dealer." Affiant also knows through training and experience that individuals involved in dealing drugs often have multiple cell phones that are used in an effort to reduce the ability of law enforcement to track them.

Affiant also knows through training and experience a cell phone will have certain specific identifiers that are unique to each phone. Cell phone records already obtained will contain such information used to identify the phone.

Affiant believes a search of the residence at 313 Waterwood Drive, Wylie, Texas could result in locating the suspect cell phone with the number 972-693-4560 that was used in the Capital Murder. This belief is based on the fact that Dunnington has mentioned that he had several (at least 10) cell phones in his room. Dunnington has not had access to that room due to being incarcerated and Dunnington made it clear to Harris not to move or touch his property in his room. Affiant also believes information gathered from the suspect cell phone could lead to evidence related to the Capital Murder.

(Dkt. #10-34, p. 245).

Upon executing the warrant, officers obtained the "shooter phone" associated with the murder of Velasquez, along with a gun cleaning kit, a .45 caliber magazine reloader, and another cell phone. (Dkt. #10-4, pp. 186-90; Dkt. #10-7, pp. 218-19). Trial counsel filed a motion to suppress the evidence on the basis that the description of the items seized did not match the

description of the items contained in the search warrant. (Dkt. #10-2, pp. 69-70). At the hearing on the motion to suppress, Detective Pfahning testified that Petitioner had been incarcerated since the 2013 jail call and had no reason to believe that Petitioner's room had been changed or disturbed in any way. (Dkt. #10-4, p. 195). The trial court granted the motion as to the cell phone that did not match the description of the "shooter phone" in the warrant and denied the motion in all other respects. (Dkt. #10-2, pp. 203-04). The recording of the jail call was not admitted into evidence.

In his state habeas application, Petitioner argued that trial counsel was ineffective for failing to argue that the search warrant affidavit lacked probable cause because it was based on stale information. Mr. Franklin addressed the issue as follows in his affidavit:

> The third issue involves the search warrant for the house where Applicant was living in Wylie, Texas. The first part argues that the warrant was based on illegally obtained evidence. That argument was addressed above. There was no illegally obtained evidence. The second part of the argument is that the information from a jail call was stale. This is a capital murder case. The information came from the suspect himself. It involved items in his room that he indicated that he did not want disturbed. The **Flores** case, a drug case in which information was provided by a third party, cited by the Applicant supports our position that the information was not stale. There are no cases that would justify a motion to suppress on staleness. *Gonzales v. State*, 761 S.W. 2d 809 (Tex. App.—Austin 1988) and progeny contain what we knew about the law at that time.

(Dkt. #10-34, pp. 237, 243). At the evidentiary hearing, Ms. McClung testified that she listened to the August 2013 jail call and based her motion to suppress on what she saw in the affidavit and the return. (Dkt. #10-34, p. 228-31).

After finding defense counsel credible (Dkt. #10-34, p. 363, ¶¶ 1-6), the state habeas court issued the following findings concerning this claim:

> 25.    Applicant alleges that trial counsel was ineffective because counsel did not challenge the search warrant on the grounds that the information in the probable cause affidavit was stale;

26. According to Applicant, counsel should have played the recording of his telephone conversation with his mother at a suppression hearing to show that there was information that the cellphones could have been moved;

27. The probable cause affidavit in this case states that (a) the affiant learned from the narcotics arrest report that pictures of a Nokia cell phone believed to be the suspect phone was in Applicant's property at the Plano City jail; (b) phone records showed that the suspect phone was tracked from the area of the murder to a cell tower close to Applicant's home at 313 Waterwood immediately after the offense; (c) the suspect cell phone's last tracking information shows the cell phone hitting off of the same cell tower in the area of Applicant's house the day after the murder; (d) surveillance information indicated that Applicant was in the same area as the suspect phone while it was being tracked; (e) the cell phone was intentionally deactivated the day after the murder; (f) Applicant was arrested and had been in custody since January 2012; (g) on January 4, 2014, the affiant learned from the Collin County District Attorney's Office that jail phone calls indicated that Applicant had several cell phones in his room at his residence; (h) the affiant listened to the calls; (i) in a call on August 17, 2013, Applicant instructed his mother to go to his room and retrieve a number from him from a collection of phones in his room; (j) Applicant told his mother that there were 10 cell phones in the room; (k) during the same call, Applicant's mother told him that she boxed up the cell phones and placed the box under his bed and this upset Applicant; (l) subsequent phone calls revealed that Applicant made it clear to his mother not to touch things in his room; and (m) no other calls show any movement of the phones for any reason;

28. The probable cause affidavit concludes that the affiant has reason to believe that a search of Applicant's residence at 313 Waterwood Drive could result in locating the suspect cell phone used in the capital murder because Applicant has 10 cell phones in his room, he has not had access to his room, and he made clear to his mother not to move or touch his property in his room;

29. Trial counsel filed a motion to suppress based on the fact that the evidence seized and photographed exceeded the scope of the warrant;

30. The trial court held a hearing on the motion to suppress and at the conclusion of the hearing granted the motion with regard to a cellphone that was seized that was not part of the search warrant and denied the motion with regard to all other evidence;

31. Prior to filing a motion to suppress, counsel reviewed the probable cause affidavit and the search warrant;

32.    Counsel also listened to the recording that was the basis for the probable cause affidavit;

33.    Counsel based her motion to suppress on what she saw in the affidavit and the return;

34.    As recently as 2018, the state of the law was that a warrant was not required for law enforcement to obtain cell site location information from cell-phone providers;

35.    Applicant has not shown by a preponderance of the evidence that counsel was deficient for not arguing that the search warrant lacked probable cause on the grounds that it relied on cell-phone data or that such an argument would have been sustained;

36.    The four corners of the probable cause affidavit clearly states that Applicant's mother told him that she boxed up the cell phones and placed the box under his bed and this upset Applicant; subsequent phone calls revealed that Applicant made it clear to his mother not to touch things in his room; and no other calls show any movement of the phones for any reason;

37.    Applicant has failed to prove by a preponderance of the evidence that counsel was deficient for failing to argue lack of probable cause due to staleness and that such an argument would have been sustained;

38.    Trial counsel did listen to the recordings of the jail calls referenced in the probable cause affidavit;

39.    Any challenges to the search warrant must be based on the facts contained within the four corners of the affidavit;

40.    Applicant has failed to prove by a preponderance of the evidence that counsel was deficient for not listening to and presenting the recordings at the hearing on the motion to suppress and that he suffered any prejudice from trial counsel's alleged deficiency.

(Dkt. #10-34, pp. 367-70). The TCCA subsequently denied relief without a written order based on the findings of the state habeas court after a hearing and on the court's independent review of the record (Dkt. #10-26), which constitutes an adjudication on the merits. *See Singleton*, 178 F.3d at 384.

Petitioner has failed to even attempt to rebut he presumption of correctness entitled to the state court's factual findings with clear and convincing evidence. Petitioner asserts, however, that the state court's decision involved an unreasonable application of federal law because Detective Pfahning relied on stale information to request a search warrant for the "shooter phone," and thus, trial counsel provided ineffective assistance by failing to argue in the motion to suppress that the affidavit supporting the search warrant for the "shooter phone" lacked probable cause. (Dkt. #1, p. 8; Dkt. #2, pp. 44-50).

The Fourth Amendment provides that warrants may not issue except on a showing of probable cause. U.S. Const. amend. IV. Similarly, under Texas law, a search warrant may be obtained from a magistrate judge only after submission of an affidavit setting forth substantial facts establishing probable cause. Tex. Code Crim. Proc. Ann. art. 18.01(b). Probable cause exists if, under the totality of the circumstances set forth in the affidavit before the magistrate judge, there is a "fair probability" that contraband or evidence of a crime will be found in a particular place at the time the warrant is issued. *Illinois v. Gates*, 462 U.S. 213, 238 (1983); *Flores v. State*, 319 S.W.3d 697, 702 (Tex. Crim. App. 2010). "Probable cause must be found to exist at the time the warrant issues." *United States v. Hyde*, 574 F.2d 856, 864 (5th Cir. 1978). If the facts alleged in the affidavit are so dated that no reasonable police officer could believe that probable cause exists, then the issuance of a search warrant violates the Fourth Amendment. *United States v. Kleinkauf*, 487 F. App'x 836, 838-39 (5th Cir. 2012). "When evaluating the staleness of information in an affidavit, this Court considers the particular facts of the case, including the nature of the unlawful activity and of the evidence sought, especially whether the evidence is of the sort that can reasonably be expected to be kept for long periods of time in the place to be searched." *United*

*States v. Robinson*, 741 F.3d 588, 597 (5th Cir. 2014) (quoting *United States v. Craig*, 861 F.2d 818, 822-23 (5th Cir. 1988)). Similarly, the TCCA has explained:

> Probable cause has an important time element. Probable cause ceases to exist when it is no longer reasonable to presume that items, once located in a specified place, are still there. Conversely, it may be reasonable under all the circumstances to presume that they are still where they once were—even after a considerable lapse of time.
>
>> The substantive question is whether probable cause existed at the time the warrant issued to believe that the items were still located [at the place to be searched]. [citation omitted].
>>
>> Probable cause is not determined by merely counting the number of days between the time of the facts relied upon and the warrant's [sic] issuance. [citations omitted]. The significance of the length of time between the point probable cause arose and when the warrant issued depends largely upon the property's [sic] nature, [citation omitted]; and should be contemplated in view of the practical considerations of every day life. [citation omitted]. The test is one of common sense.

*Gonzales v. State*, 761 S.W.2d 809, 813 (Tex. App. 1988) (citations omitted).

The state court's findings of fact—which Petitioner has failed to rebut with clear and convincing evidence—establish that, although five months elapsed between the jail call and the issuance of the warrant, the warrant affidavit contained information indicating that the "shooter phone" was used to orchestrate the murder and remained undisturbed in Petitioner's bedroom at his parents' home. Thus, the state court record demonstrates that probable cause existed at the time the warrant issued to believe that the "shooter phone" was still located at the place to be searched— namely, Petitioner's bedroom in his parents' home. Petitioner has failed to overcome the presumption that trial counsel made a reasonable and strategic decision not to base a motion to suppress on staleness. *See Wilkerson v. Collins*, 950 F.2d 1054, 1065 (5th Cir. 1992); *Strickland*, 466 U.S. at 689. Nor has he demonstrated that such a motion would have been granted. *Johnson v. Cockrell*, 306 F.3d 249, 255 (5th Cir. 2002) (counsel is not required to make frivolous or futile

motions or objections). Most importantly, Petitioner has failed to show that the state court unreasonably applied *Strickland* or any other federal law when it denied this ineffective assistance claim. In sum, Petitioner fails to show that there was no reasonable basis for the state court to deny relief. *Richter*, 562 U.S. at 98. There are no grounds for habeas relief under Claim Three, and the claim should be denied.

## V.  CONCLUSION

Petitioner has failed to show that any of his claims have merit. Specifically, Petitioner has failed to demonstrate that trial counsel rendered ineffective assistance under *Strickland*. Above all, Petitioner fails to show that the state court proceedings resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States, or that the decision was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings. *Williams*, 529 U.S. at 402-03, 405-06; *Childress v. Johnson*, 103 F.3d 1221, 1224-25 (5th Cir. 1997). In sum, Petitioner fails to show that there was no reasonable basis for the state court to deny relief. *Richter*, 562 U.S. at 98. Accordingly, Petitioner's habeas petition should be denied and dismissed.

## VI.  CERTIFICATE OF APPEALABILITY

An appeal may not be taken to the Court of Appeals from a final order in a proceeding under 28 U.S.C. § 2254 unless a circuit justice or judge issues a certificate of appealability. 28 U.S.C. § 2253(c)(1)(B). Although Petitioner has not yet filed a notice of appeal, it is recommended that the Court, nonetheless, address whether Petitioner would be entitled to a certificate of appealability. *See Alexander v. Johnson*, 211 F.3d 895, 898 (5th Cir. 2000) (holding that a district court may *sua sponte* rule on a certificate of appealability because "the district court

that denies a petitioner relief is in the best position to determine whether the petitioner has made a substantial showing of a denial of a constitutional right on the issues before that court," noting that "[f]urther briefing and argument on the very issues the court has just ruled on would be repetitious").

A certificate of appealability may issue only if a petitioner has made a substantial showing of the denial of a constitutional right. 28 U.S.C. § 2253(c)(2). The Supreme Court fully explained the requirement associated with a substantial showing of the denial of a constitutional right in *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). In cases where a district court rejected constitutional claims on the merits, the petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong. *Id.*; *Henry v. Cockrell*, 327 F.3d 429, 431 (5th Cir. 2003). When a district court denies a motion on procedural grounds without reaching the underlying constitutional claim, a certificate of appealability should issue when the petitioner shows, at least, that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling. *Id.*

In this case, it is recommended that reasonable jurists could not debate the denial of Petitioner's § 2254 petition on substantive or procedural grounds, nor find that the issues presented are adequate to deserve encouragement to proceed. *See Miller-El v. Cockrell*, 537 U.S. 322, 336-37 (2003) (citing *Slack*, 529 U.S. at 484). Accordingly, it is recommended the Court find that Petitioner is not entitled to a certificate of appealability.

## VII.  RECOMMENDATION

It is recommended that the above-styled petition filed under 28 U.S.C. § 2254 be denied and that the case be dismissed with prejudice. It is further recommended that a certificate of appealability be denied.

Within fourteen days after service of the magistrate judge's report, any party must serve and file specific written objections to the findings and recommendations of the magistrate judge. 28 U.S.C. § 636(b)(1)(c). To be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the magistrate judge's report and recommendation where the disputed determination is found. An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific.

Failure to file specific, written objections will bar the party from appealing the unobjected-to factual findings and legal conclusions of the magistrate judge that are accepted by the district court, except upon grounds of plain error, provided that the party has been served with notice that such consequences will result from a failure to object. *See Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1430 (5th Cir. 1996) (*en banc*), *superceded by statute on other grounds*, 28 U.S.C. § 636(b)(1) (extending the time to file objections from ten to fourteen days).

**So ORDERED and SIGNED this 27th day of March, 2023.**

KIMBERLY C. PRIEST JOHNSON
UNITED STATES MAGISTRATE JUDGE